UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

CAROL DEE COX and
SAMMIE ROGERS COX,

Plaintiffs,

v. No. 3:04-CV-527 (Varlan/Guyton)

CARRIER SALES & DISTRIBUTION,

Defendant.

**REPORT AND RECOMMENDATION**

This matter is before the undersigned pursuant to 28 U.S.C. § 636(b), the Rules of this Court, and by Order [Doc. 24] of the Honorable Thomas A. Varlan, United States District Judge, for a report and recommendation on the defendant's Motion for Summary Judgment [Doc. 11].

## I. Introduction

This is a discrimination and retaliation action brought by the plaintiff Carol Cox ("Cox") against her former employer, Carrier Sales & Distribution ("Carrier").[1] Specifically, the plaintiff asserts causes of action under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101,

[1]The plaintiff originally identified her employer as Carrier Mid-South Knoxville. The defendant Carrier Sales & Distribution filed an answer, asserting that Carrier Mid-South Knoxville was not the plaintiff's employer and thus not a proper party defendant. The parties agree that the proper party defendant is Carrier Sales & Distribution.

*et seq.* ("ADA"); the Equal Pay Act, 29 U.S.C. § 206(d); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.* ("THRA"); and the Tennessee Handicap Act, Tenn. Code Ann. § 8-50-103 ("THA"). Additionally, the plaintiff asserts a claim of intentional infliction of emotional distress under Tennessee state law. Cox's husband, Sammie Cox, also asserts a claim for loss of consortium. [Doc. 1].

It is admitted that Carrier is an "employer" within the meaning of the various state and federal statutes under which the plaintiff brings this action; that Cox filed a charge with the EEOC; and further, that the EEOC issued the plaintiff a Notice of Right to Sue on July 8, 2004. [Doc. 3]. The subject matter jurisdiction of the Court is not in dispute. [Doc. 2].

After carefully considering the entire record, the Court concludes that summary judgment in favor of Carrier is proper as to all of the plaintiff's claims. Accordingly, for the reasons set forth herein, it is **RECOMMENDED** that the defendant's Motion for Summary Judgment [Doc. 11] be granted and that this case be dismissed.

## II. Relevant Facts

As required by Rule 56 of the Federal Rules of Civil Procedure, the Court will recite and consider the relevant facts in the light most favorable to the plaintiff. In doing so, the Court relies on the depositions of the plaintiff Carol Cox and several Carrier employees, and other testimony and exhibits filed with the Court.

The plaintiff was initially hired by Andrews Distributing on December 27, 1999 as an administrative assistant in the Knoxville office. She was 47 years old at the time. In 2001,

Andrews Distributing was bought out by Carrier. [Cox Dep. at 17-19]. The office in which the plaintiff worked was part of a region which included offices in Knoxville, Chattanooga, and the Tri-Cities area. Glenn Loper ("Loper") is the Market Manager for this region, and all 35 employees in this region ultimately report to him. Loper works in the Chattanooga office. Scott Henry ("Henry") is the Residential Sales Manager in the Knoxville office and was the plaintiff's immediate supervisor. Henry reports directly to Loper. [Loper Dep. at 13].

As an administrative assistant, the plaintiff was responsible for the "general running of the office," including assisting Henry and the other salespeople, and "making sure that everything that needed to be done was done." [Cox Dep. at 58]. Several duties were added to the plaintiff's job responsibilities over the years, including ordering literature, covering the phones on a more frequent basis, managing accounts payable, handling questions about insurance, and keeping up with program changes. [Id. at 170-71]. The plaintiff admitted that she "had a pretty full plate." [Id. at 173].

**A. Bridgett Johnson**

In May, 2003, Carrier hired 37-year-old Bridgett Johnson ("Johnson"). Johnson testified that she was hired as an administrative assistant in the Knoxville office. [Johnson Dep. at 9]. The plaintiff, on the other hand, claims that Johnson was hired as a receptionist, whose duties were to answer the phones and handle the mail. [Cox Dep. at 59, 65]. Johnson's starting salary was higher than the plaintiff's. [Id. at 67]. Christa Carsello ("Carsello"), the Human Resources Manager, explained that this was because Johnson had more education, experience, and computer skills. [Carsello Dep. at 94-95].

The plaintiff claims that soon after Johnson was hired, Johnson began performing some of the plaintiff's job duties. For example, the plaintiff discovered an email on Johnson's desk indicating that Johnson was working on updating the office's antiquated phone system, a project on which the plaintiff had been working. [Cox Dep. at 77-78]. The plaintiff did not talk to management about this incident, reasoning that if "they had given it to [Johnson] to do, then I was going to let her go ahead and do it." [Cox Dep. at 82].

Another one of plaintiff's job duties was to keep up with new dealer accounts. In July, 2003, the plaintiff discovered an email on Johnson's desk from Shirley Cronkite, a temporary administrative assistant in the Chattanooga office, regarding a spreadsheet that was to be kept on new dealers. The email stated that the plaintiff was to help Johnson fill out this information. The plaintiff contacted Cronkite to ask why she needed the information, and Cronkite told her that Johnson would be keeping this information up to date from now on. [Doc. 12 Ex. 6].

In August, 2003, the plaintiff learned that Johnson was ordering food for a Lunch & Learn program put on by Carrier for one of its clients in Oak Ridge. Previously, the plaintiff had prepared the lunches herself for these programs through her catering business, but that ceased when Henry decided that it was a conflict of interest. [Doc. 12 Ex. 8; Cox Dep. at 95].

In September, 2003, the plaintiff learned that Johnson was going for training on the administration of HVAC Partners, a website program for Carrier dealers. Previously, the plaintiff had been the program's administrator. [Cox Dep. at 111-12]. The plaintiff called Carsello in Human Resources and asked why Johnson was being sent for training instead of her. Carsello told her that Henry would come talk to her about it. Henry told the plaintiff that he wanted Johnson to be brought up to speed on the program because Johnson would be doing the online warranties. [Id. at 115].

The plaintiff stated that Henry was very angry with the plaintiff for raising the issue with Carsello first. During this discussion, Henry told her that she was doing a good job and asked her why she could "not just be satisfied with that." [Id. at 119].

### B. Job Performance Issues

Prior to January, 2004, the plaintiff had never been disciplined. [Cox Aff. ¶ 18]. In January, 2004, the plaintiff received a Performance Alert [Doc. 12 Ex. 10] from Scott Henry regarding the plaintiff's absence from work. The Performance Alert states that the plaintiff had been "absent during critical times" on several recent occasions, and the plaintiff was admonished to call in and speak with Henry directly when she called in sick and not to have any one call in for her. The plaintiff wrote on the form that she was not aware that she had to speak with Henry personally. [Id.; Cox Dep. at 151]. The plaintiff testified that other employees had called in requesting sick leave without speaking to Henry directly. [Cox Dep. at 152]. Henry also noted in the Performance Alert that the plaintiff's "attitude and teamwork requires improvement as well so that you are not the source of frustration, or controversy for others." The Performance Alert further states: "Immediate improvement is required, or further action, up to and including termination will be taken." [Doc. 12 Ex. 10].

During the meeting on this Performance Alert, Henry told the plaintiff that she had a negative attitude, and that other employees viewed her as inaccessible because she kept her office door closed. The plaintiff explained that she was often cold at work and had a space heater under her desk, so she would close her door to keep the heat in. [Cox. Dep. at 155]. Henry also told her that she had become a source of frustration for other employees in the office, and that some

employees had complained to him that they did not want to use the plaintiff for tasks because of her attitude. [Id. at 156, 157].

Glenn Loper performed a Performance Evaluation on the plaintiff in January, 2004. [Doc. 12 Ex. 11]. In this review, Loper noted that the plaintiff was "out of the office too much" due to illness and taking too long to run business errands. [Loper Dep. at 24, 27]. He also noted that the plaintiff did a "[g]ood job when available," but that she was "[o]ut of [the] office wa[y] too much to depend on for important meetings." Loper testified that this latter comment was in reference to a January, 2004 strategy meeting that had been scheduled in Knoxville for all of Carrier's sales people in the East Tennessee region. Loper sent the plaintiff quota information to put in a particular format, but the plaintiff did not complete the project in time for the meeting because she was out sick. [Loper Dep. at 40-41]. Loper testified that he "had to improvise, and go in there and get it done myself." [Id. at 41]. He did not give her a written reprimand for this. [Id.].

Loper also described an incident where the plaintiff did not get the price books out on time, which cost Carrier some money because dealers could not be charged the new, higher prices until the price books were sent out. [Id. at 42, 84]. The plaintiff was supposed to prepare the price books, but did not finish them before going on vacation. [Henry Dep. at 18]. Before returning to work from vacation, the plaintiff also took some sick time. [Id. at 81]. However, she did not communicate to anyone that the price books still needed to be done. [Id. at 81-82]. Henry talked to the plaintiff about this issue, but no formal action was taken against the plaintiff. [Loper Dep. at 42].

In the overall objective rating of the Performance Evaluation, Loper noted that "[w]ith a better attitude and a proactive approach to helping all other employees her performance

could improve." [Doc. 12 Ex. 11]. Loper explained in his deposition that this comment was in reference to the fact that sometimes the plaintiff would respond to requests for help from salespeople by stating that she did not have time, and he felt that she needed to be more proactive in helping all salespeople in the office. [Loper Dep. at 49-50]. Loper testified that every salesperson in the office had complained to him about the plaintiff's unwillingness to help. [Id. at 51]. He felt that the plaintiff had a "bad attitude towards the salespeople" and that the salespeople "couldn't depend on her to help, so they went somewhere else" because it was easier to ask another employee for assistance than it was to ask the plaintiff. [Id. at 66]. It was Loper's impression that the plaintiff did not seem to care if the company succeeded. [Id.].

Henry received complaints from salespeople about the plaintiff's lack of timeliness and accuracy. [Henry Dep. at 69]. Henry felt that the plaintiff was not proactive in seeking work or showing initiative. [Id. at 80].

**C. Hostile Work Environment**

The plaintiff alleges that she was subjected to a hostile work environment. For example, during a business meeting in Gatlinburg, an intoxicated Scott Henry said to the plaintiff, "hey big momma, what are you doing up this late . . . old ladies like you should be in bed right now." Henry made this comment in front of several other Carrier employees, as well as the plaintiff's husband. [Cox Dep. at 36-37]. Cox did not report this incident to any management at Carrier. [Id. at 39, 40].

The plaintiff also recalled that Henry would make lewd remarks and use foul language in speaking to other employees, and that he had on occasion said things to her that she

considered to be "obscene." [Id. at 39]. The plaintiff could not recall specific comments Henry made, only that he used curse words in speaking with other employees and in Monday morning meetings. [Id. at 41]. She testified that after the Performance Alert in January, 2004, Henry "deliberately said things and did things knowing that I would overhear or that I was in the room to purposefully intimidate me or to make me feel uncomfortable." [Id. at 275].

The plaintiff also testified that Henry's attitude toward her contributed to a hostile work environment. She recalled that if she went in to ask him a question, Henry would give a "very agitated, irritated type response," and that he was sometimes gruff or short-tempered with her. [Id. at 42]. The plaintiff testified that Henry "made it very difficult to ask questions to him" by not giving complete answers or directions for what he wanted. [Id. at 43]. She also recalled that he would make comments showing a negative attitude towards women, including sexually explicit jokes. The plaintiff could not recall any specific statements or jokes that were made. [Id. at 50]. She estimated that she had overheard Henry make inappropriate jokes approximately five to ten times in the past year. [Id. at 51]. She did not report these incidents to Human Resources because she "didn't feel they would listen." Instead, she would just leave the room when the jokes were made. [Id. at 52].

The plaintiff claims that Johnson also contributed to the hostile work environment by taking over some of the plaintiff's job duties. The plaintiff stated that she was not sure that Johnson was doing this because Henry instructed her to do these tasks or whether Johnson herself had asked to do them. [Id. at 55]. The plaintiff also stated that on some days, Johnson would not speak to her at all. [Id.].

The plaintiff also claims that Henry's supervisor, Glenn Loper, contributed to the hostile work environment. The plaintiff claims that Loper would occasionally use four-letter words in the office. She also claims that Loper's performance evaluation of her also contributed to the hostile work environment. [Id. at 56].

### D. Plaintiff's Medical Conditions

The plaintiff has diabetes and high blood pressure. [Id. at 231]. The plaintiff testified that she is "pretty much" able to live a normal life by controlling her diet and taking insulin. [Id. at 233-34]. She does have to go to the bathroom about once an hour because of her diabetes, but she stated that this does not affect her job one way or the other. [Id. at 235]. The plaintiff's high blood pressure sometimes gives her headaches and makes her feet and legs swell. The plaintiff takes medication to help alleviate these symptoms. Medication keeps her blood pressure within an acceptable range on most days. [Id. at 235]. When the plaintiff's feet are swollen, it is sometimes hard for her to walk or stand for long periods of time. [Id. at 237].

The plaintiff is also morbidly obese. [Cox Aff. at ¶ 42-43]. The plaintiff states that being overweight affects all areas of her life and prevents her from doing a lot of things that other people can do, such as walking for a long distance, bending a lot, sitting in small chairs or chairs with arms, and wearing certain clothes and shoes. [Cox Dep. at 240]. The plaintiff testified she is able to bend and could, for example, pick her purse off the floor. The plaintiff stated that she requested and received a new office chair with adjustable arms as an accommodation for her weight. [Cox Dep. at 240-41].

The plaintiff stated that she believes that she was laid off due to a disability because she "wasn't able to do some of the things around the office that . . . other people might be able to do more easily," such as dressing more modern. She also feels that, based upon the type of small, petite people he hired, Henry "would prefer someone that was smaller." [Id. at 242-43]. The plaintiff also believes that Henry discriminated against her because she had to go to the bathroom a lot. [Id. at 243].

### E. The March 18, 2004 Letter

On March 18, 2004, the plaintiff sent a three-page letter to Carrier's ombudsman, Brian Nugent, listing several complaints or concerns that she had about issues in the office, including allegations of ethical violations and other improper behavior by Scott Henry. The plaintiff sent the letter anonymously. Included in her complaints was that "[o]lder employees or employees who are 'different' are treated differently than younger employees and employees who do not 'party' after hours" and that

> [o]lder employees are definitely discriminated against, as every employee that has been terminated by Carrier since their take over has been over the age of fifty with the exception of one and all of these employees were chosen for termination by Scott Henry. Younger employees have been hired for positions that older employees hold making 33% more a year than the older employee. The older employee then has to teach them the job they were hired to do making the higher salary.

[Doc. 12 Ex. 13].

After receiving the letter, the ombudsman contacted Loper. Management spent two days investigating the allegations in the letter by contacting dealers and employees and eventually determined that the allegations did not have merit. [Loper Dep. at 72-73]. The plaintiff was asked

by both management and other employees if she sent the letter. In the plaintiff's opinion, "everyone knew [she] had sent the letter." [Cox Aff. at ¶¶ 32-35].

On May 6, 2004, the plaintiff was terminated. She was told that she was being terminated due to a position restructure. [Cox Dep. at 217]. When asked why she was selected for termination and not Johnson, the plaintiff was told that she was selected because of her attitude. [Id.; Cox Aff. at ¶ 37]. Loper testified that Cox was terminated because Carrier had a new phone system, thus requiring only one administrative assistant in Knoxville, and because an administrative assistant was needed in Chattanooga to assist him. [Loper Dep. at 78]. Loper testified that the position in Knoxville had to be eliminated because Carrier permitted the region to have only a certain number of employees. [Loper Dep. at 79]. The plaintiff was not offered the administrative position in Chattanooga. [Carsello Dep. at 105]. Carrier subsequently hired 55-year-old Donna Coulter to fill the Chattanooga position. [Henry Dep. at 13]. After the plaintiff's termination, Johnson's duties as the Knoxville administrative assistant did not change. Most of the duties that were previously performed by the plaintiff were transferred to the Chattanooga position. [Johnson Dep. at 31].

The plaintiff states in her affidavit that at the time that she was terminated in May 2004, the Knoxville office of Carrier did not have a new phone system. [Cox Aff. at ¶ 39]. Loper testified that the new phone system was installed around April, 2004; that it took a long time to get installed; and that he was not sure when the installation was completed. [Loper Dep. at 79].

The plaintiff also states in her affidavit that at the time of her termination and for as long as she had worked for Andrews and Carrier, there was a full-time administrative assistant in Chattanooga. [Cox Aff. ¶ 40]. In her deposition, however, the plaintiff had testified that

Chattanooga had only a temporary administrative assistant for approximately a year in 2003, and that at the time of her termination, there was not an administrative assistant in Chattanooga. [Cox Dep. at 254-55]. Loper also testified that he did not have an administrative assistant in Chattanooga to assist him. [Loper Dep. at 48].

The plaintiff currently provides day care services out of her home, runs a clothing and jewelry business out of her home, and continues to have a catering business. [Cox Dep. at 143, 279, 282].

## III. The Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing that there is no genuine issue of material fact lies upon the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In considering a motion for summary judgment, the Court must take all of the evidence submitted by the non-moving party as true, and must draw all reasonable inference in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. Id. at 248. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In reviewing the evidence, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52; see also Gaines v. Runyon, 107 F.3d 1171, 1174-75 (6th Cir. 1997) (requiring non-moving party "to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial" in order to defeat summary judgment).

## IV. Analysis and Ruling

### A. Age Discrimination

The Court will first address the plaintiff's claim of age discrimination brought pursuant to the ADEA and the THRA. The plaintiff alleges that she was terminated because of her age and that she was replaced by Bridgett Johnson, a younger employee.[2]

[2]The plaintiff also alleges in the Complaint that Carrier had a pattern and practice of terminating employees over the age of forty and replacing them with people under the age of 40. [Doc. 1]. However, the plaintiff may not prove her discrimination claim with pattern-or-practice evidence. "[T]he pattern-or-practice method of proving discrimination is not available to individual plaintiffs." Bacon v. Honda of America Mfg, Inc., 370 F.3d 565, 575 (6th Cir. 2004), cert. denied, 543 U.S. 1151 (2005).

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Claims brought under the THRA are governed by the same evidentiary framework that applies to ADEA claims. See Bruce v. Western Auto Supply Co., 669 S.W.2d 95, 97 (Tenn. Ct. App. 1984). Accordingly, the Court's analysis with respect to the ADEA will apply with equal force to the plaintiff's claim under the THRA.

A plaintiff may meet her evidentiary burden under the ADEA in one of two ways. Mitchell v. Vanderbilt University, 389 F.3d 177, 181 (6th Cir. 2004). On the one hand, a plaintiff may offer direct evidence of the employer's discriminatory motive by producing "evidence, which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (quoting Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999)). If, on the other hand, a plaintiff is unable to provide direct evidence of an improper motive, she may offer indirect and circumstantial evidence of such a motive pursuant to the burden-shifting approach established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

In order to establish a *prima facie* case of age discrimination using circumstantial evidence under the McDonnell Douglas framework, a plaintiff must show that: (1) she is a member of the protected class, that is, she is at least forty years of age; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) she was replaced by a younger person. Rowan v. Lockheed Martin Energy Systems, Inc., 360 F.3d 544, 547 (6th Cir. 2004). A person is not "replaced," however, "when another employee is assigned to perform the

plaintiff's duties in addition to other duties or when the work is redistributed among other existing employees already performing related work." Barnes v. GenCorp., Inc., 896 F.2d 1457, 1465 (6th Cir. 1990).

Once the plaintiff has made out a *prima facie* case, the burden shifts to the defendant to give a legitimate, non-discriminatory reason for the termination. Rowan, 360 F.3d at 547. If the defendant satisfies this burden, the burden shifts back to the plaintiff to show that the legitimate reasons offered were merely pretext for a decision "actually motivated by an unlawful bias against age." Id. A plaintiff may satisfy this burden "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Wexler, 317 F.3d at 576 (quoting Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000)).

The plaintiff has not presented any direct evidence of an improper motive based upon age; accordingly, the Court must examine the plaintiff's age discrimination claim according to the McDonnell-Douglas burden-shifting framework. The parties do not dispute that the plaintiff was a member of a protected class, that she was qualified for her position, or that she was subjected to an adverse employment action. The parties do dispute, however, whether the plaintiff was replaced by a younger employee. The defendant argues that the plaintiff cannot establish that she was replaced by a younger employee because the employee who replaced her, Donna Coulter, is actually older than the plaintiff. The plaintiff counters that she was replaced not by Coulter, but by Bridgett Johnson. At the very least, the plaintiff contends, that a genuine issue of material fact exists as to whether she was replaced by Coulter or Johnson.

The plaintiff bases her contention that she was replaced by Johnson on the fact that Johnson was hired as a receptionist in 2003 but subsequently became the administrative assistant for the Knoxville office after the plaintiff's termination. Carrier disputes this, arguing that Johnson was hired as an administrative assistant and thus did not "replace" the plaintiff.

Even accepting as true the plaintiff's contention that Johnson was hired as a receptionist, the Court concludes that the plaintiff was not replaced by Johnson. Even if Johnson's job title was technically that of a receptionist, it is clear from the testimony of Johnson and of the plaintiff herself that Johnson was performing substantially similar duties to the plaintiff prior to her termination. "A 'person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.'" Grosjean v. First Energy Corp., 349 F.3d 332, 336 (6th Cir. 2003), cert. denied, 541 U.S. 1010 (2004) (quoting Barnes, 896 F.2d at 1465). Johnson was neither hired nor reassigned to perform the plaintiff's duties; she was already assigned administrative assistant duties in the Knoxville office at the time of the plaintiff's termination. Accordingly, the Court concludes that the plaintiff was not replaced by Johnson.

If the plaintiff was replaced at all, the undisputed facts demonstrate that Carrier eliminated the plaintiff's position in Knoxville in order to create an administrative position in Chattanooga and that this position was filed by Donna Coulter, who is in fact older than the plaintiff. Accordingly, the plaintiff cannot show that she was replaced by a younger employee, and her *prima face* case of discrimination fails.

Even if the plaintiff could make a *prima facie* case, she has failed to demonstrate that the legitimate, non-discriminatory reasons for her termination given by the defendant were pretextual. Carrier proffered two primary reasons for eliminating the plaintiff's position: (1) the updating of the antiquated phone system, which eliminated the need for two administrative assistants in Knoxville and (2) the need for a permanent administrative assistant position in Chattanooga to assist Loper. The plaintiff contends that these proffered reasons have no basis in fact. First, the plaintiff argues that at the time of her termination, the new phone system had not yet been installed. Second, the plaintiff argues that there was no need to create an administrative assistant position in Chattanooga because, according to her affidavit, there was a full-time administrative assistant position in Chattanooga for as long as the plaintiff had worked for Andrews and Carrier. [Cox Aff. at ¶ 40].

With respect to the updating of the phone system, the defendant argues that regardless of whether the phone system was updated shortly before or shortly after the plaintiff's termination, there is no dispute that the system has been updated, thereby eliminating the need for the second administrative assistant position in Knoxville. The plaintiff acknowledged in her deposition that she knew that the new phone system was coming. [Cox Dep. at 180-81]. Indeed, purchasing an upgraded phone system was one of the duties that the plaintiff claims was taken away from her by Johnson. Thus, there does not appear to be any real dispute that Carrier planned on upgrading its phone system and that, while the installation of the new phone system may not have been completed on the day of the plaintiff's termination, the installation was completed shortly thereafter. There also does not appear to be any dispute that the upgraded phone system eliminated the need for two administrative assistant positions in Knoxville. Accordingly, the Court cannot say that the

defendant's first proffered reason for eliminating the plaintiff's position in Knoxville had no basis in fact.

With respect to the need for a permanent administrative assistant position in Chattanooga, the plaintiff states in her affidavit that there had always been a "full-time" administrative assistant in Chattanooga, and thus, the defendant's proffered reason for her termination was pretext. The plaintiff's affidavit, however, is in direct contradiction with her earlier deposition testimony in which she acknowledged that the administrative assistant who worked in Chattanooga was only a temporary worker who had worked for approximately a year in 2003, and further, that at the time of her termination, there was no administrative assistant in Chattanooga. [Cox Dep. at 254-55]. "[A] party cannot create a factual issue by filing an affidavit which contradicts earlier deposition testimony after a motion for summary judgment has been made. If an affidavit is untimely and inconsistent with prior discovery responses, it is inadmissible and should not be considered." Graham v. American Cyanamid Co., 350 F.3d 496, 509 (6th Cir. 2003), cert. denied, 541 U.S. 990 (2004).

In summary, the Court concludes that the plaintiff has failed to make a *prima facie* case of age discrimination because she cannot show that she was replaced by a younger worker. Even if a *prima facie* case could be made, the plaintiff has failed to show that the reasons given for her termination were pretext. Accordingly, it is **RECOMMENDED** that the plaintiff's claims of age discrimination under the ADEA and the THRA be dismissed.

### B. Age Discrimination – Retaliation

Next, the plaintiff alleges that she was terminated in retaliation for reporting the discrimination against older employees. [Doc. 1]. The defendant argues that the plaintiff cannot establish a *prima facie* case of retaliation because she cannot show the element of causation.

To establish a *prima facie* case of retaliation, a plaintiff must show "(1) that the plaintiff engaged in a protected activity; (2) that the defendant had knowledge of the plaintiff's protected conduct; (3) that the defendant took an adverse employment action towards the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." Weigel v. Baptist Hosp., 302 F.3d 367, 381 (6th Cir. 2002). In order to demonstrate a causal connection, "'a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken' in the absence of the protected conduct." Id. (quoting Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000)).

The defendant argues that even if the plaintiff satisfied the first three elements of a *prima facie* case, she cannot show that there was a causal connection between the protected activity and her termination. The Court agrees. The Sixth Circuit has held that "[a] causal link may be shown through knowledge combined with closeness in time." Weigel, 302 F.3d at 381 (quoting Johnson v. University of Cincinnati, 215 F.3d 561, 582 (6th Cir. 2000)). In the present case, the plaintiff testified that in her opinion, "everyone knew" that she had written the anonymous letter. Beyond the plaintiff's sheer speculation, however, there is no evidence that any decision makers knew that the letter originated from her. Moreover, the decision to terminate the plaintiff came approximately six weeks after the anonymous letter was sent. Compare Weigel, 302 F.3d at 381 (finding decision to reject plaintiff's application was made "shortly" after decision makers became aware of plaintiff's complaints of age discrimination). In short, the plaintiff has not produced any

evidence to suggest a causal connection between her sending the anonymous letter and her termination.

Even if the plaintiff could establish a *prima facie* case, however, the Court would find, for the reasons set forth *supra*, that the defendant is nevertheless entitled to summary judgment on the plaintiff's retaliation claim because the plaintiff has failed to carry her burden of showing that the defendant's legitimate, nondiscriminatory reasons for her termination were pretext.

For these reasons, it is therefore **RECOMMENDED** that the plaintiff's retaliation claim be dismissed.

### C. Disability Discrimination

In her complaint, the plaintiff alleges that she suffers from diabetes and hypertension; that frequent urination is a symptom of her conditions; that as a result of these conditions, she is required to eat within a certain time period each day; and that she was reprimanded and eventually terminated because of her disability in violation of the ADA and the THA. [Doc. 1]. In her deposition, the plaintiff further asserted that her obesity constituted a disability for which she was terminated. The plaintiff contends that these medical conditions substantially affected the major life activity of working, as she was required to go to the bathroom frequently and was frequently absent from work for medical reasons, two reasons the plaintiff contends that were used to justify her selection for termination.

The defendant counters that neither the plaintiff's diabetes nor high blood pressure substantially limits her in any major life activity. The defendant further argues that the plaintiff's weight does not constitute an impairment under the ADA because the plaintiff has not shown that

her weight is the result of any physiological disorder, and further, that the plaintiff has not shown that her weight substantially limits her in any major life activity. Finally, the defendant argues, the plaintiff cannot show that her job was eliminated solely because of a disability.

To establish a claim of disability discrimination under the ADA or THA, a plaintiff must show: (1) that she has a disability; (2) that she was qualified to perform the requirements of her job, with or without reasonable accommodation; and (3) that she was discriminated against solely because of her disability. Mahon v. Crowell, 295 F.3d 585, 589 (6th Cir. 2002); see also Barnes v. Goodyear Tire & Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000) (stating that THA claim is analyzed under same principles as those used for the ADA). Where, as in this case, the plaintiff seeks to prove her case indirectly, without direct proof of discrimination, the plaintiff may show a *prima facie* case of disability discrimination by showing that : (1) she is disabled; (2) she is otherwise qualified for the position, with or without a reasonable accommodation; (3) she suffered an adverse employment action; (4) the employer knew or had reason to know of her disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1186 (6th Cir. 1996). Once the plaintiff sets out a *prima facie* case, the burden shifts to the defendant employer to offer a legitimate, non-discriminatory reason for its action. Id. If the defendant satisfies this burden, the plaintiff must then show that the proffered reason is pretext. Id.

The ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). In the present case, the plaintiff claims that she is disabled because she has several physical impairments

– specifically, diabetes, hypertension, and morbid obesity – that substantially limit one or more major life activities. The plaintiff has not alleged that she had a record of an impairment or was regarded by the defendant as having such an impairment. Accordingly, the Court will limit its analysis to the first definition of disability, that is, having a physical or mental impairment that substantially limits one or more major life activities.

"[W]hether a person has a disability under the ADA is an individualized inquiry." Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999); 29 C.F.R. pt. 1630, App. § 1630.2(j) (2005) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual").

The parties do not dispute that diabetes and hypertension constitute physical "impairments." The defendant argues, however, that the plaintiff's obesity cannot be considered an impairment unless she suffers from morbid obesity which results from some type of physiological disorder. In support of this argument, the defendant relies upon the federal regulations, which define "physical or mental impairment" as follows:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
> (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (2005). The appendix to this regulation goes on to explain as follows:

> It is important to distinguish between conditions that are impairments and physical, psychological, environmental, cultural and economic

> characteristics that are not impairments. The definition of the term "impairment" does not include physical characteristics such as eye color, hair color, left-handedness, or height, weight or muscle tone that are within "normal" range and are not the result of a physiological disorder.

29 C.F.R. § 1630.2(h) (App. 2005). Thus, "physical characteristics that are 'not the result of a physiological disorder' are not considered 'impairments' for the purposes of determining either actual or perceived disability." Andrews v. State of Ohio, 104 F.3d 803, 808 (6th Cir. 1997).

In the present case, the plaintiff states in her affidavit that she is morbidly obese, and the defendant has not presented any proof to the contrary. Moreover, morbid obesity has been found to constitute a physical impairment within the meaning of the ADA. See Cook v. State of Rhode Island Dep't of Mental Health, Retardation, and Hospitals, 10 F.3d 17, 25 (1st Cir. 1993). Accordingly, the Court finds that the plaintiff has made a *prima facie* showing that the plaintiff's obesity is a physical impairment within the meaning of the ADA.

Merely having an impairment, however, "does not make one disabled for purposes of the ADA." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002). "Claimants also need to demonstrate that the impairment limits a major life activity." Id. While there is not an exhaustive list of major life activities, the Supreme Court has recognized that "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working" constitute major life activities. Sutton, 527 U.S. at 480 (quoting 29 C.F.R. § 1630.2(i)).

The plaintiff claims that she is substantially limited by her impairments in several major life activities, including walking, bending, sitting, and working. The defendant correctly points out that both the Supreme Court and the Sixth Circuit have noted the "conceptual difficulties"

involved in defining "working" as a major life activity. See Sutton, 527 U.S. at 492; Mahon, 295 F.3d at 590. Nevertheless, the Sixth Circuit has repeatedly recognized, post-Sutton, that working does constitute a major life activity under the ADA. See Mahon, 295 F.3d at 590; Henderson v. Ardco, Inc., 247 F.3d 645, 652 (6th Cir. 2001); Ross v. Campbell Soup Co., 237 F.3d 701, 709 (6th Cir. 2001). Because of the problems surrounding this particular category of life activities, however, the Sixth Circuit treats "working" as more of a "residual category resorted to only when a complainant cannot show she or he is substantially impaired in any other, more concrete major life activity." Mahon, 295 F.3d at 590. The Court will therefore first address whether the plaintiff is substantially limited in life activities other than working.

Although the plaintiff has diabetes and high blood pressure, she testified that she is "pretty much" able to live a normal life by controlling her diet and taking insulin. When the plaintiff's feet are swollen, it is sometimes hard for her to walk or stand for long periods of time. However, she also admitted that she could walk for up to a half-mile at a time. The plaintiff further testified that she is not able to bend a lot. She admitted, however, that she is able to bend and could, for example, pick her purse off the floor. The plaintiff also stated that she has trouble sitting in small chairs or chairs with arms. However, this evidence does not show that the plaintiff is substantially limited in her ability to actually engage in the activity of sitting, rather that she is merely limited in the type of chairs that she may sit.

Based upon the plaintiff's testimony, the Court cannot say that the plaintiff has produced evidence demonstrating that she is substantially limited in her ability to sit, bend or walk. An "impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the [ADA]." Mahon, 295 F.3d at 590-91. While

the evidence shows that the plaintiff's obesity and other medical conditions somewhat limit her in the performance of bending, sitting, and walking, the Court does not find that there is evidence present in the record from which a reasonable juror could conclude that the plaintiff is "severely" restricted in any of these activities. See id. at 591.

The plaintiff also claims that she is substantially limited in the major life activity of working. Specifically, she contends that her medical conditions required her to take frequent trips to the bathroom and also required her to have frequent absences from work. To be considered substantially limited in the major life activity of working, the Supreme Court has stated that a plaintiff

> must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

Sutton, 527 U.S. at 492.

The Court finds that the plaintiff has failed to make a *prima facie* case that she is precluded from a broad range of jobs as a result of her need to take frequent trips to the bathroom or even to take frequent absences from work. In fact, the plaintiff testified that she is currently engaged in a broad range of work activities, including a child care business, a catering business, and the sale of clothes and jewelry out of her home. Accordingly, the Court finds that the plaintiff has failed to produce evidence to show that she is substantially limited in the major life activity of working as a result of her medical conditions.

Assuming that the plaintiff could make a *prima facie* case of disability discrimination, the burden would then shift to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. Williams v. London Util. Comm'n, 375 F.3d 424, 428 (6th Cir. 2004). As discussed earlier in this opinion, the Court finds that the defendant has proffered legitimate, non-discriminatory reasons for the elimination of the plaintiff's position, and further, that the plaintiff has failed to meet her burden of demonstrating that these legitimate reasons are pretext. Accordingly, it is **RECOMMENDED** that the plaintiff's disability discrimination claims also be dismissed.

**D. Equal Pay Act**

The plaintiff withdraws her Equal Pay Act claim. [Doc. 19]. Accordingly, it is **RECOMMENDED** that the defendant's Motion for Summary Judgment be granted with respect to the plaintiff's Equal Pay Act claim.

**E. Hostile Work Environment**

In her complaint, the plaintiff alleges that she was subjected to a sexually charged hostile work environment. [Doc. 1]. The defendant argues that the plaintiff's hostile work environment claim fails because the vast majority of the conduct of which the plaintiff complains is not actionable harassment; that she was not subjected to an environment that was severe and pervasive; and that she failed to report this harassment to Carrier.

The plaintiff responds that viewing the facts in the light most favorable to the plaintiff, the workplace and environment were sufficiently hostile, and summary judgment is therefore not appropriate.

Title VII of the Civil Rights Act of 1964 provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[3] The Supreme Court has held that this provision "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment.'" Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted).

In order to prove a hostile work environment claim, the plaintiff must demonstrate the following:

> 1) the employee is a member of a protected class, 2) the employee was subject to unwelcomed sexual harassment, 3) the harassment was based on the employee's sex, 4) the harassment created a hostile work environment, and 5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior.

Bowman v. Shawnee State Univ., 220 F.3d 456, 462-63 (6th Cir. 2000). To show a hostile work environment, the plaintiff must meet both an objective and a subjective test: "the conduct must be

[3]The Tennessee Supreme Court has noted that the THRA is "coextensive with federal law." Parker v. Warren County Util. Dist., 2 S.W.3d 170, 172 (Tenn. 1999).

severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." Id. at 463.

In determining whether the alleged harassment is sufficiently severe or pervasive, the Court must consider the totality of the circumstances. Williams v. General Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999). Among the appropriate factors the Court may consider is "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. "[T]he issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether – taken together – the reported incidents make out such a case." Williams, 187 F.3d at 562. Mere isolated incidents, "unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." Bowman, 220 F.3d at 463.

'Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex." Oncale, 523 U.S. at 80. Thus, conduct that is not sexual in nature may be illegally sex-based and thus considered in the hostile environment analysis only if the employee can show that but for her gender, she would not been subjected to the harassment. Bowman, 220 F.3d at 463.

The standards for determining the existence of a hostile work environment "are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Accordingly, "the ordinary tribulations of the workplace, the sporadic use of abusive language, gender-related jokes, and occasional teasing" do not rise to the level of severe and pervasive conduct creating a hostile environment. Id.

In the present case, the plaintiff contends that she was subjected to cursing and sexually explicit jokes. She also contends that she was further humiliated when her intoxicated supervisor said to her at a business function, and in the presence of her husband and other employees, "hey big momma, what are you doing up this late . . . old ladies like you should be in bed right now." Additionally, in her deposition, the plaintiff recounted several instances that she claims contributed to the hostile environment, including Johnson taking over some of the plaintiff's job duties and that on some days, Johnson would not speak to her at all. The plaintiff also claims that Loper's performance evaluation of her also contributed to the hostile work environment. The plaintiff also testified that Henry's attitude toward her contributed to a hostile work environment. She recalled that if she went in to ask him a question, Henry would give a "very agitated, irritated type response," and that he was sometimes gruff or short-tempered with her. She also recalled that he would make comments showing a negative attitude towards women, including sexually explicit jokes. She estimated that she had overheard Henry make inappropriate jokes approximately five to ten times in the past year. In light of all of these incidents, the plaintiff argues, the work environment was sufficiently hostile.

The Court disagrees. The plaintiff estimated that there were five to ten incidents in the last year when she overheard sexually explicit jokes. However, she does not remember the specifics of any of these incidents, nor is there any evidence to suggest that these jokes were directed to her at all. As for the use of foul language by Henry, Loper, and others, there is no evidence that the plaintiff was subjected to this language because of her gender. See Williams, 187 F.3d at 565 (holding that non-sexual conduct may contribute to hostile work environment where employee is subjected to conduct because of her gender). Nor is there any evidence that Johnson's behavior or

Loper's review of the plaintiff's performance were offensive acts related in any way to the plaintiff's gender. These actions simply cannot support a hostile environment claim. While Henry's drunken comment to the plaintiff was inappropriate, and the language used and the jokes told by her fellow employees may have been crude and distasteful, these relatively isolated incidents are merely offensive remarks that fall far short of being sufficiently pervasive, hostile or abusive to support a claim of a hostile work environment. See, e.g., Clark v. United Parcel Serv., 400 F.3d 341, 351 (6th Cir. 2005) (finding three isolated incidents of vulgar jokes and inappropriate physical contact over two years did not constitute hostile work environment); Burnett v. Tyco Corp., 203 F.3d 980, 985 (6th Cir. 2000), (holding that single battery, along with two offensive remarks over six-month period did not create hostile work environment); Morris v. Oldham County Fiscal Court, 201 F.3d 784, 790 (6th Cir. 2000) (finding that teasing, offhand comments and isolated sexual advance did not create hostile work environment).

For the foregoing reasons, it is **RECOMMENDED** that the plaintiff's hostile work environment claims under Title VII and the THRA be dismissed.

## F. Intentional Infliction of Emotional Distress

The plaintiff claims that the defendant's termination of her for a pretextual reason and the "big mamma" comment made by Scott Henry constitute outrageous conduct which resulted in mental distress to the plaintiff.

"To state a claim for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was so outrageous that it cannot be tolerated by civilized society; and (3) the defendant's conduct

resulted in serious mental injury to the plaintiff." Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004). It is not enough to show that the defendant acted with tortious or criminal intent; the plaintiff must "show that the defendant's conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Miller v. Willbanks, 8 S.W.3d 607, 614 (Tenn. 1999)).

Even taking all of the plaintiff's allegations as true, the Court does not find that the plaintiff's termination or the comment made by Henry rise to the level of "atrocious" or "utterly intolerable"conduct so as to give rise to a claim for intentional infliction of emotional distress. Accordingly, it is **RECOMMENDED** that the plaintiff's claim for intentional infliction of emotional distress be dismissed.

### G. Loss of Consortium

The plaintiff's husband, Sammie Cox, asserts a claim for loss of consortium under Tennessee law. Loss of consortium is a derivative claim. See Tuggle v. Allright Parking Sys., Inc., 922 S.W.2d 105, 108 (Tenn. 1996). Accordingly, because the Court has recommended that the plaintiff's claims be dismissed, it is further **RECOMMENDED** that Sammie Cox's loss of consortium claim be dismissed as well.[4]

---

[4]In the memorandum in support of its motion, the defendant notes that it "appears" that the plaintiff is asserting a claim of religious discrimination, as she references in her complaint that she was "ridiculed about being a Christian." The complaint, however, does not specifically set forth a claim for religious discrimination, nor does the plaintiff address such a claim in her response to the defendant's motion for summary judgment. Accordingly, the Court finds that the plaintiff is not pursuing a claim of religious discrimination in this case.

**V. Conclusion**

For the reasons set forth above, and based upon the entire record in this case, it is **RECOMMENDED** that the defendant's Motion for Summary Judgment [Doc. 11] be **GRANTED**.[5]

Respectfully submitted,

s/ H. Bruce Guyton
United States Magistrate Judge

---

[5]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).